**Martin Allen FINE, Plaintiff-Appellant,**

v.

**BARRY AND ENRIGHT PRODUCTIONS, Goodson-Todman Productions, Merrill Heatter Productions, Incorporated, National Broadcasting Company, Incorporated, American Broadcasting Companies, CBS Inc., Merv Griffin Productions, Defendants-Appellees.**

No. 83–5899.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 3, 1984.

Decided April 25, 1984.

Martin Allen Fine, pro per.

Robert M. Nau, Silverberg, Rosen, Leon & Behr, Los Angeles, Cal., for defendants-appellees.

Before SNEED, KENNEDY, and BOO-CHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

Fine appeals from a summary judgment dismissing his antitrust claim for lack of standing under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. He alleges that agreements between game show producers and television networks limiting the number of game show appearances by non-celebrity guests violate section 1 of the Sherman Act, 15 U.S.C. § 1. We hold that Fine has standing to pursue his claim, but affirm the district court's dismissal based on a rule of reason analysis.

### FACTS

Fine applied to appear on six game shows over a four-year period. In July 1978, he competed on "Tic Tac Dough," winning $5,393 in cash and prizes. In May 1980, he applied to be on "Bulls Eye," but was not selected. In November 1980, he appeared on "Password Plus" and won $5,682.85 in cash and prizes. In January 1982, he competed on "Blockbusters" and received $211.45 in prizes. That same month Fine applied to become a contestant on "Joker's Wild." His application was accepted and he was invited to return to the studio for taping. When the show's producers learned of his previous game show appearances, however, they disqualified him. In February 1982, Fine applied to appear on "Battlestars," but was not chosen.

During this period, Fine was a law student at Pepperdine University and held several part-time jobs as a waiter, municipal court clerk, agent-trainee, and salesman. Between 1978 and 1982 Fine's taxable income was $15,494.34, of which $8,517.85 represented game show winnings.

The three network defendants have different standards on non-celebrity game show appearances. The networks have agreements with their respective game show producers requiring compliance with these standards. NBC limits contestants to three game shows in a lifetime. ABC will not accept contestants who have appeared on a game show once in the past twelve months or twice within the past five years. CBS eliminates applicants who have been on one game show in the past twelve months or on two game shows in a lifetime.

Two of the producers have their own standards on non-celebrity appearances. Barry and Enright Productions limits contestants to one show within the past twelve months or not more than two shows within the past ten years. Merrill Heatter Productions requires contestants to agree not to appear on any other game show in the ninety days following an appearance on a Merrill Heatter game show.

The district court granted summary judgment for the defendants, ruling that Fine did not have standing because he had not alleged injury to his "business" or "property" as required by section 4 of the Clayton Act. The court denied standing for section 16 injunctive relief based on a finding that Fine failed to demonstrate a significant threat of future injury.

### STANDARD OF REVIEW

In reviewing a grant of summary judgment, our task is identical to that of the trial court. *State ex rel. Edwards v. Heimann*, 633 F.2d 886, 888 n. 1 (9th Cir. 1980). Viewing the evidence in the light most favorable to the party against whom summary judgment was granted, we must determine whether the trial court correctly found that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. *Chelson v. Oregonian Pub. Co.*, 715 F.2d 1368, at 1370 (9th Cir.1983). "We may affirm summary judgment on any ground appearing on the record whether or not the district court relied on it." *Ber-*

*nard v. City of Palo Alto,* 699 F.2d 1023, 1024 n. 1 (9th Cir.1983) (per curiam).

## DISCUSSION

### A. Standing

Section 4 of the Clayton Act allows recovery of treble damages by "[any] person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. The lack of restrictive language in section 4 reflects an expansive remedial purpose and an intent to protect all who are made victims of forbidden practices. *See Blue Shield of Virginia v. McCready,* 457 U.S. 465, 472, 102 S.Ct. 2540, 2545, 73 L.Ed.2d 149 (1982).

 The district court acknowledged, and we agree, that, in the absence of the restrictive policies challenged by Fine, there is no reason why a person could not make a business out of being a game show contestant. The word business "includes that which occupies the time, attention and labor of men for the purpose of ... pecuniary reward." *Roseland v. Phister Mfg. Co.,* 125 F.2d 417, 419 (7th Cir.1942); *see also Hawaii v. Standard Oil Co.,* 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972) ("words 'business or property' ... refer to commercial interests or enterprises"). Merely because defendants are not obliged to accept particular applicants as contestants, does not mean that one could not engage in contests as a business. Defendants' arguments that a non-celebrity could not successfully engage in contests as a business are based largely upon the very restrictions on repeat appearances which Fine challenges.

The district court found that Fine as an individual had not engaged in game show participation as a business and therefore lacked section 4 standing. Although the issue is close, we believe that Fine has raised a triable issue of fact.[1]

Section 4 grants standing to prospective entrants to a business as well as to existing industry members if a prospective entrant has "taken substantial demonstrable steps to enter an industry" and has been "thwarted in that purpose by antitrust violations." *Solinger v. A & M Records, Inc.,* 586 F.2d 1304, 1309 (9th Cir.1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979). This circuit has endorsed a four factor "intention and preparedness" test under which we consider:

1. The background and experience of plaintiff in his prospective business ...
2. Affirmative action on the part of plaintiff to engage in the proposed business ...
3. The ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business ...
4. The consummation of contracts by plaintiff ...

*Id.* at 1309–10, *quoting Waldron v. British Petroleum Co., Ltd.,* 231 F.Supp. 72, 81–82 (S.D.N.Y.1964); *see also Parks v. Watson,* 716 F.2d 646, 660 (9th Cir.1983) (per curiam) (setting out the same factors). Regardless of the distinction between an existing and a prospective enterprise we find the four factor analysis useful in considering the issue of Fine's standing.

Fine has made six attempts to compete in four years and has been successful on three occasions. In the context of game show participation this constitutes significant "background and experience" and also demonstrates "affirmative action" on his part to make a business out of contest appearances. "Ability to finance" is not a relevant factor, as contest participation is labor intensive. Fine's actual participation on three occasions is equivalent to "consummation of contracts".

 We do not, as did the district court, believe Fine's status as a law student, engagement in part-time employment and failure to make special efforts to im-

---

1. Because we find that Fine has standing under section 4 of the Clayton Act, and ultimately find the challenged practices lawful, it is unnecessary to decide whether Fine has section 16 standing.

prove contest skills mandate the conclusion that he was not engaged in or attempting to engage in business for purposes of section 4. A business can be conducted on a part-time basis. In the absence of the challenged restrictions, Fine might well have spent more time as a contestant and less time in other, less remunerative part-time employment. His earnings from contests constituted more than half his taxable income over a four year period. Fine's partial success demonstrates that he already possessed the skills necessary to make a business of contest participation.

In short, there was evidence from which a trier of fact could conclude that Fine did everything reasonably possible to make a business out of contest participation. We conclude that he has established a triable issue of fact whether he was injured in his business and consequently has standing. We therefore turn to the issue of whether the restrictions violate section 1 of the Sherman Act, 15 U.S.C. § 1.

B. Rule of Reason Versus Per Se Analysis

■ Fine contends that the network-producer agreements restricting non-celebrity appearances constitute a group boycott, a per se violation of section 1 of the Sherman Act. In so doing, Fine misapprehends the fundamental nature of a group boycott. Even though a boycott can, and often does, span more than a single level, some concerted effort at a single market level—a horizontal combination or agreement—is requisite before the type of per se violation commonly termed a "group boycott" can be found to exist. L. Sullivan *Handbook of the Law of Antitrust* § 83 (1977); *see Cascade Cabinet Co. v. Western Cabinet and Millwork*, 710 F.2d 1366, 1370 (9th Cir. 1983); *see, e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212–13, 79 S.Ct. 705, 709–10, 3 L.Ed.2d 741 (1959) (combination of manufacturers, distributors and a retailer to deprive another retailer of opportunity to buy certain appliances); *Fashion Originators' Guild of America, Inc. v. F.T.C.*, 312 U.S. 457, 312 U.S. 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941)

(agreement by garment designers and manufacturers not to sell to retailers handling garments resulting from "style piracy"). Cases cited by Fine are not to the contrary. *See St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978) (agreement by insurance companies to offer malpractice insurance only on a "claims made" basis); *Washington State Bowling Prop. Ass'n v. Pacific Lanes*, 356 F.2d 371 (9th Cir.) *cert. denied*, 384 U.S. 963, 86 S.Ct. 1590, 16 L.Ed.2d 674 (1966) (owners of bowling establishments agreed to restrict tournament and league eligibility to bowlers not frequenting competing establishments); *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049 (C.D.Cal.1971) (challenge to bylaws of association of basketball teams).

In an attempt to show a horizontal agreement Fine construes the restrictions on repeat appearances as consciously parallel. Defendants' evidence, however, explained the development of those restrictions. Network policies designed to insure credibility and integrity were developed after a number of scandals in the 1950s based on allegations of collusion between non-celebrity contestants and producers enabling certain contestants to continue to win. The restrictions were partially designed to prevent some contestants from gaining an advantage by virtue of familiarity with contest selection and television taping procedures. The restrictions also arose from a belief that the audience appeal of game shows is maximized by contest participants perceived as similar to audience members in skills and ability. Networks have received letters from viewers complaining of repeated gameshow appearances by certain individuals. The networks' restrictions vary widely and were adopted independently, at different times. Only two of the producers have such standards. These standards also differ.

■ The agreements between the networks and producers which Fine alleges violate section 1 are vertical. Even if one assumes that the restrictions on repeat ap-

pearances constitute consciously parallel action, such action alone is insufficient to establish a conspiracy. *Granddad Bread, Inc. v. Continental Baking Co.*, 612 F.2d 1105, 1112 (9th Cir.1979), *cert. denied*, 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 84–85 (9th Cir.1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). There is no factual basis for finding a horizontal agreement, combination or conspiracy between networks or between producers.

A per se rule is generally not applied when a concerted refusal to deal is vertical rather than horizontal. *Cascade Cabinet Co.*, 710 F.2d at 1371. In deciding whether to apply a per se rule instead of a rule of reason analysis to conduct outside of a previously recognized per se category, the critical inquiry is whether the "practice facially appears to be one that would almost always tend to restrict competition and decrease output." *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1052 (9th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983), *quoting Broadcast Music, Inc. v. Columbia Broadcasting System Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). Fine has not shown any general anticompetitive effect by virtue of the challenged rules, despite their effect upon him personally. Even assuming the requisite anticompetitive effect, we lack the experience with this sort of business relationship which would justify creating a new per se classification. *See Cascade Cabinet Co.*, 710 F.2d at 1372, *citing Broadcast Music, Inc.*, 441 U.S. 1, 9–10, 99 S.Ct. 1551, 1556–1557, 60 L.Ed.2d 1.

We proceed, therefore, with a rule of reason analysis.

C. Application of the Rule of Reason

"Rule of reason analysis calls for a 'thorough investigation of the industry at issue and a balancing of the arrangement's positive and negative effects on competition.'" *Cascade Cabinet Co.*, 710 F.2d 1373, *quoting Northrop*, 701 F.2d at 1050.

To establish a section 1 violation under the rule of reason, a plaintiff must show an agreement which is intended to harm or unreasonably restrain competition and actually does so. *Cascade Cabinet Co.*, 710 F.2d at 1373, *citing Reid Brothers Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292 (9th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 279, 78 L.Ed.2d 259 (1983). Plaintiff must show injury to a market or to competition in general, not merely injury to individuals. *Cascade Cabinet Co.*, 710 F.2d at 1373, *citing Klamath Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau*, 701 F.2d 1276 (9th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).

As previously discussed, there exist valid reasons for the networks' restrictions on repeat appearances. Moreover, Fine has failed to show any general anticompetitive effect caused by the restrictions. The pool of individuals applying to compete is much larger than the number of individuals who can actually be accommodated as contestants. When an experienced contestant is denied an opportunity to compete, an inexperienced applicant is afforded a chance to fill the vacancy. Fine fails to allege or demonstrate the type of injury to the contestant "market" requisite to a rule of reason recovery. Because there are no material issues of fact which have bearing on our rule of reason analysis, summary judgment is affirmed.

AFFIRMED.

SNEED, Circuit Judge, Concurring in the Result of the Judgment.

The majority reached the correct result in affirming the judgment below.

However, it strayed from the mark in its disposition of the standing issue. Summary judgment was proper under the circumstances with which the district court was confronted. The legal issue was whether the appellant had engaged in contest participation as a business. That issue can also be characterized as an "ultimate fact," the establishment of which "involve[s] the ap-

plication of predominantly legal standards to undisputed historical facts." *See* Schwarzer, *Summary Judgment Under The Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 472 (1984). As such it is an issue quite suitable for resolution by a court. *See, e.g., Parks v. Watson,* 716 F.2d 646, 660 (9th Cir.1983) (in determining standing to assert antitrust claim, lower court properly held there was no material question of fact in finding that plaintiff's company had taken insufficient "demonstrable steps" to enter offsite geothermal heat business). The so-called historical facts are not genuinely disputed; what is disputed is the standing of the appellant to assert a cause of action under the Sherman Act. This is an issue of law and policy. Schwarzer, *supra,* at 472. The district court held the appellant lacked standing while the majority renders an almost delphic judgment. To the majority standing would exist provided either a jury or a judge, acting as a factfinder, so concluded. It strongly suggests, however, that a "true" factfinder would find that standing exists.

We should fish or cut bait on the standing issue. Either the district court is right or it is wrong. Additional historical facts would not likely become available even if this case were to be remanded which, of course, it will not be. The majority only has succeeded in unnecessarily reducing the clarity of the principles of standing. Since it wished to decide the case on the basis of the rule of reason versus per se issue, it should have assumed, without deciding, that the appellant had standing.

For my part I would decide the case on the basis of standing and hold that the district court was right. I would not treat six attempts to compete, of which three were successful, as either sufficient background and experience or the required affirmative action demanded by the four factor analysis of *Solinger v. A & M Records, Inc.,* 586 F.2d 1304, 1309 (9th Cir.1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979). Moreover, I disagree completely with the majority's conclusion that the district court erred in believing

that appellant's "status as a law student, engagement in part time employment and failure to make special efforts to improve contest skills" required the holding that appellant was not in the business of contest participation. Maj. op. p. 1397–1398. The fact that he was barred from certain television game shows cannot be used to excuse appellant from demonstrating that his business is contest participation. The game shows are not the only contests in town. To say that he is in the business of competing in game shows because he cannot compete in game shows strips the notion of business of its substance and borders on nonsense.

I have no doubt there is a business of contest participation, just as there is a business of gambling; but appellant's activities were no more the business of contest participation than would the playing of slot machines in Nevada every third or fourth weekend be the business of gambling.

I would not reach the rule of reason versus per se analysis issue.

KENNEDY, Circuit Judge, concurring:

I concur.

A company is free, as a general rule, to design its products to its own specifications without facing the charge of a vertical combination in restraint of trade. Nothing more occurred here. The networks, acting independently, decided to produce amateur game shows, and they were free to so specify to their producers. This is not a vertical conspiracy at all but simply a contract to purchase a specified product from the producers and then market it to a television audience. That, it seems to me, is the heart of the case.

The vertical restraint cases cited in the opinion of the court are ones in which parties on two different market levels agree to exclude a third party who is in horizontal competition with one of them. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 209, 79 S.Ct. 705, 707, 708, 3 L.Ed.2d 741 (1959); *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.,* 710

F.2d 1366, 1370–71 (9th Cir.1983). Those cases seem inapposite because Fine does not compete with the networks or the producers in any respect.

The majority analysis is entirely correct in pointing out that no horizontal agreements are implicated here. The network's policies were lawful and privileged.